1   **LEVI & KORSINSKY, LLP**
    David E. Bower, Esq.   SBN 119546
2   600 Corporate Pointe, Suite 1170
    Culver City, CA   90230-7600
3   310-839-0442
    Fax: 310-558-3005
4   email:  dbower@zlk.com

5   **LEVI & KORSINSKY, LLP**
    Joseph Levi, Esq.
6   30 Broad Street, 15th Floor
    New York, New York 10004
7   Tel:  212-363-7500
    Fax: 212-363-7171

8   Attorneys for Plaintiff

FILED

2010 DEC 20 P 4 01

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

9

10

11              **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**

12  SARAH P. HEINTZ, individually and on behalf of      Case No.
    all others similarly situated,

13                                                **CV10    5789**
                                   Plaintiff,

14  v.

15  RICHARD   WOLFORD,   MARY   HENDERSON,         **CLASS ACTION COMPLAINT FOR**
16  TIMOTHY   BRUER,   SAMUEL   ARMACOST,          **VIOLATION OF THE FEDERAL**
    TERENCE MARTIN, JOE MORGAN, DAVID               **SECURITIES LAWS, AND FOR**
17  WILLIAMS,    VICTOR    LUND,    SHARON          **VIOLATION OF STATE LAW**
    MCCOLLAM,     DEL     MONTE     FOODS           **BREACHES OF FIDUCIARY DUTY;**
18  COMPANY,    BLUE   ACQUISITION   GROUP,         **CERTIFCATE OF PLAINTIFF AND**
    INC., and BLUE MERGER SUB INC.,                 **ATTORNEY UNDER SECURITIES**
19                                                       **LAWS ATTACHED**

20                                 Defendants.           **JURY TRIAL DEMANDED**

21

22          Plaintiff, by her attorneys, alleges upon information and belief, except for her own acts,

23  which are alleged on knowledge, as follows:

24          1.      Plaintiff brings this action on behalf of the public stockholders of Del Monte Foods

25  Company ("Del Monte" or the "Company") against Del Monte and its Board of Directors (the

26  "Board") seeking equitable relief for their violations of Section 14(a) of the Securities Exchange

27

28
                                          - 1 -

Act of 1934 (the "Exchange Act") and Rule 14a-9 promulgated thereunder ("Rule 14a-9"), breaches of fiduciary duty and other violations of state law, arising out of their attempt to sell the Company to an investor group led by funds affiliated with Kohlberg Kravis Roberts & Co. L.P. ("KKR"), Vestar Capital Partners ("Vestar") and Centerview Partners ("Centerview") (collectively the "Buyout Group") by means of an unfair process and for an unfair price of $19.00 in cash for each share of Del Monte common stock (the "Proposed Transaction"). The Proposed Transaction is valued at approximately $5.3 billion, including the assumption of approximately $1.3 billion in net debt.

2.      As described below, the Proposed Transaction as currently constituted is unfair to Del Monte's shareholders because it does not adequately value the Company's future growth prospects, which will inure to the Buyout Group if the Proposed Transaction is consummated. Moreover, Barclays Capital Inc. ("Barclays Capital"), the Company's financial advisor in connection with the Proposed Transaction has a material conflict of interest. Barclays Capital is participating in the financing of the Proposed Transaction and will receive significant compensation due to its participation. Accordingly, the credibility of the fairness opinion presented by Barclays Capital stating that the $19.00 per share cash consideration was fair to the Company's stockholders, and the process conducted by the Board whereby Barclays Capital led the negotiations on behalf of the Company with the Buyout Group is highly suspect. In addition, the "go-shop" period being conducted by Barclays Capital is also materially tainted considering Barclays Capital has a significant interest in seeing that a transaction is consummated with the Buyout Group as opposed to any other party.

3.      In addition, on December 15, 2010, the Company filed a Schedule 14A Proxy Statement (the "Proxy") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. The Proxy fails to provide the Company's shareholders

- 2 -

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

with material information and/or provides them with materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Transaction. Chief among the disclosure deficiencies, the Proxy fails to disclose the financial and other terms of Barclays Capital's individual involvement in the financing, including the amount they have committed to provide, the corresponding interest rates, and the significant compensation they will receive.

4.     Del Monte's Board has violated Rule 14a-9 and has breached its fiduciary duties to shareholders, and Del Monte has aided and abetted such breaches. Accordingly, to prevent the Company's shareholders from suffering irreparable harm from the consummation of an unfair and inadequate takeover, Plaintiff seeks injunctive relief, damages, and any other appropriate relief unless and until Defendants remedy their violations and breaches.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Rule 14a-9. This court has jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.

6.     Venue is proper in this District because many of the acts and practices complained of herein occurred in substantial part in this District. In addition, Del Monte maintains its principal executive offices in San Francisco, California.

## PARTIES

7.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Del Monte.

8.     Del Monte is a corporation organized and existing under the laws of the State of Delaware. It maintains its principal corporate offices at One Market @ The Landmark, San Francisco, California 94105, and is one of the country's largest and most well-known producers,

distributors and marketers of premium quality, branded pet products and food products for the U.S. retail market, generating approximately $3.7 billion in net sales in fiscal 2010.

9.       Defendant Richard Wolford ("Wolford") has been the Chief Executive Officer and a director of the Company since April 1997. Wolford was elected President of Del Monte in February 1998 and was elected Chairman of the Board in May 2000.

10.      Defendant Mary Henderson ("Henderson") has been a director of the Company since 2006.

11.      Defendant Timothy Bruer ("Bruer") has been a director of the Company since 1997.

12.      Defendant Samuel Armacost ("Armacost") has been a director of the Company since 2002.

13.      Defendant Terence Martin ("Martin") has been a director of the Company since 2002.

14.      Defendant Joe Morgan ("Morgan") has been a director of the Company since 2002.

15.      Defendant David Williams ("Williams") has been a director of the Company since 2002.

16.      Defendant Victor Lund ("Lund") has been a director of the Company since 2005.

17.      Defendant Shawn McCollam ("McCollam") has been a director of the Company since 2007.

18.      Defendants referenced in ¶¶ 9 through 17 are collectively referred to as Individual Defendants and/or the Del Monte Board. The Individual Defendants as officers and/or directors of Del Monte, have a fiduciary relationship with Plaintiff and other public shareholders of Del Monte and owe them the highest obligations of good faith, fair dealing, loyalty and due care.

- 4 -

19. Defendant Blue Acquisition Group, Inc. is a Delaware corporation and is owned by a consortium of private equity funds affiliated with KKR, Vestar, and Centerview, i.e. the Buyout Group.

20. Defendant Blue Merger Sub Inc. is a Delaware corporation wholly owned by Blue Acquisition Group, Inc. that was created for the purposes of effectuating the Proposed Transaction.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

21. By reason of Individual Defendants' positions with the Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of Del Monte and owe them, as well as the Company, a duty of highest good faith, loyalty and full, candid and adequate disclosure.

22. Where the officers and/or directors of a publicly traded corporation undertake a transaction that will result in either: (i) a change in corporate control; (ii) a break up of the corporation's assets; or (iii) sale of the corporation, the Directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium. To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

(a)     adversely affects the value provided to the corporation's shareholders;

(b)     favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

(c)     contractually prohibits them from complying with their fiduciary duties;

(d)     will otherwise adversely affect their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

- 5 -

(e)     will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

23.     In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

(a)     participating in any transaction where the Individual Defendants' loyalties are divided;

(b)     participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

(c)     unjustly enriching themselves at the expense or to the detriment of the public shareholders.

24.     Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty and good faith owed to Plaintiff and other public shareholders of Del Monte, or are aiding and abetting others in violating those duties.

25.     Defendants also owe the Company's stockholders a duty of candor, which includes the disclosure of all material facts concerning the Proposed Transaction and, particularly, the fairness of the price offered for the stockholders' equity interest. Defendants are knowingly or recklessly breaching their fiduciary duties of candor by failing to disclose all material information concerning the Proposed Transaction, and/or aiding and abetting other Defendants' breaches.

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

26.     In committing the wrongful acts alleged herein, each of the Defendants has pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another, in furtherance of their common plan or design. In addition to the wrongful

- 6 -

conduct herein alleged as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

27. During all relevant times hereto, the Defendants, and each of them, initiated a course of conduct which was designed to and did: (i) permit Buyout Group to attempt to eliminate the public shareholders' equity interest in Del Monte pursuant to a defective sales process, and (ii) permit Buyout Group to buy the Company for an unfair price. In furtherance of this plan, conspiracy and course of conduct, Defendants, and each of them, took the actions as set forth herein.

28. Each of the Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing. The Defendants' acts of aiding and abetting included, *inter alia*, the acts each of them are alleged to have committed in furtherance of the conspiracy, common enterprise and common course of conduct complained of herein.

## CLASS ACTION ALLEGATIONS

29. Plaintiff brings this action on its own behalf and as a class action on behalf of all owners of Del Monte common stock and their successors in interest, except Defendants and their affiliates (the "Class").

30. This action is properly maintainable as a class action for the following reasons:

(a) the Class is so numerous that joinder of all members is impracticable. As of December 10, 2010, Del Monte has approximately 195.25 million shares outstanding.

- 7 -

(b)     questions of law and fact are common to the Class, including, inter alia, the following:

        (i)     Have the Individual Defendants misrepresented and omitted material facts in violation of Section 14(a) of the Exchange Act;

        (ii)    Have the Individual Defendants breached their fiduciary duties owed by them to Plaintiff and the others members of the Class;

        (iii)   Are the Individual Defendants, in connection with the Proposed Transaction of Del Monte by Buyout Group, pursuing a course of conduct that does not maximize Del Monte's value in violation of their fiduciary duties;

        (iv)    Have the Individual Defendants misrepresented and omitted material facts in violation of their fiduciary duties owed by them to Plaintiff and the other members of the Class;

        (v)     Have Del Monte, Blue Acquisition Group, Inc., and Blue Merger Sub, Inc. aided and abetted the Individual Defendants' breaches of fiduciary duty; and

        (vi)    Is the Class entitled to injunctive relief or damages as a result of Defendants' wrongful conduct.

(c)     Plaintiff is committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.

(d)     Plaintiff's claims are typical of those of the other members of the Class.

(e)     Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for Defendants.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## FURTHER SUBSTANTIVE ALLEGATIONS

### Company Background and its Poise for Growth

31.     Del Monte is one of the country's largest and most well-known producers, distributors and marketers of premium quality, branded pet products and food products for the U.S. retail market, generating approximately $3.7 billion in net sales for the fiscal year 2010, which ended May 2, 2010. With a powerful portfolio of brands, Del Monte products are found in eight out of ten U.S. households. Pet food and pet snacks brands include *Meow Mix*®, *Kibbles 'n Bits*®, *Milk-Bone*®, *9Lives*®, *Pup-Peroni*®, *Gravy Train*®, *Nature's Recipe*®, *Canine Carry-Outs*® and other brand names. Food product brands include *Del Monte*®, *Contadina*®, *S&W*®, *College Inn*® and other brand names.

32.     The Company has been performing well recently and is poised for even more growth.  On September 2, 2010, the Company announced its results for the first fiscal quarter of 2011 ending August 1, 2010. For the quarter, the Company reported a strong EPS of $0.29 per share. As stated by the Company's CFO, Dave Meyers in a conference call discussing the results: "Our EPS was solid at $0.29, down $0.01 from a record Q1 last year. For the full year, we are still tracking toward a record $1.38 to $1.42 EPS. Our cash flow was also very strong at $31 million and we expect to generate about $260 million to $270 million in cash flow for the year which would be another record." Meyers further commented on the Company's growth prospects stating: "On the

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

top line, we anticipate strong growth in Consumer and Pet in the second half reflecting solid promotional execution as well as key new product launches versus prior year."

33.     In a conference call discussing the results, Defendant Wolford commented on the Company's strong position and bright future stating: "Del Monte today is a well-positioned consumer packaged foods business. Our portfolio has been built with leading brands. We have established a powerful infrastructure. Two years ago we implemented our multiyear strategy and that has delivered results for us over the last two years. Our markets are large. They are healthy and they are growing. Importantly, they are also well-positioned with very positive consumer trends." Wolford further commented on the Company's growth prospects stating:

> As we look at the categories in which we do business, they are large, they are growing, and they enjoy very attractive dynamics. The $18 billion Pet segment continues to benefit from increased spending per Pet. It's very important to our customers and importantly it meets the needs of -- the specific needs of more than 50% of American households. These are families that have pets in their household and they simply must shop the Pet category. So we have a very focused household group and it is loyal to the products that are sold in the Pet business.
>
> Our Consumer business benefits from very positive consumer trends that include healthier eating as well as more meals at home. These are categories that are very important to our customers and they drive not only traffic but are critical to customer profitability. Two, I guess last weekend, weekend ago or so, at the GMA conference, there were repeated discussions about how important it is for retailers -- this is by retailers themselves -- to drive center store traffic and that is what our brands do.
>
> * * *
>
> Our growth strategy is working. Productivity, as I mentioned, is hitting its 3% target. We have rebalanced our trade and marketing to meet competitive challenges. We anticipate increasing the weight against marketing as the competitive conditions change over time. But we do see that with the current mix that we have that we will exit -- we will go through F'11 and exit F'11 with a very strong competitive position in each one of our brands in both Pet and in Consumer.

34.     On December 2, 2010, the Company announced its financial results for the quarter ending October 31, 2010. Despite a marginal 1.9% drop in sales, the Company reported a 30% year-over-year growth in profit for the quarter due to higher margins and lower interest expense. The Company reported net income from continuing operations of $81.1 million or $0.42 per share for

1   the second quarter, up from $62.6 million or $0.31 per share in the year-ago quarter, which included

2   $0.05 of debt refinancing costs. Earnings per share from continuing operations topped analysts'

3   consensus by seven cents.

4   ***The Proposed Transaction Is Unfair***

5   35.    Despite its recent strong performance and poise for growth, the Company agreed to

6   enter into the Proposed Transaction. In a press release dated November 25, 2010, the Company

7
    announced that it had entered into a merger agreement with the Buyout Group, pursuant to which
8
    entities owned by the Buyout Group will acquire all of the outstanding shares of Del Monte for
9
10  $19.00 per share in cash.

11  36.    The Buyout Group was excited about picking up Del Monte at such an attractive

12  price. As stated by Simon Brown, member of KKR and head of the firm's North American

13  Consumer practice: "Del Monte has a first-rate brand portfolio and excellent reputation for

14
    providing high quality and nutritious products to families and their pets. We look forward to
15
    working with the Company's talented employees and investing in the business as we continue to
16
17  execute upon Del Monte's proven strategy for growth. Del Monte is a great company, with an

18  excellent strategy, a talented team and a strong future." Brian Ratzan, Managing Director and head

19  of Vestar's Consumer group said, "Del Monte Foods is a terrific company with iconic consumer

20  and pet brands. Storied consumer franchises like Del Monte's – with great brands in growing

21  categories – will continue to thrive through investments in innovation and marketing. Vestar looks
22
    forward to working with the Del Monte team and our strategic partners to achieve the Company's
23
24  next phase of growth." Jim Kilts, Centerview's co-founder and former CEO of Kraft, Nabisco and

25  Gillette stated: "Over the last decade, Rick and the entire Del Monte team have built a unique

26  platform based on powerful brands. We are truly excited to partner with Del Monte as the Company

27

28

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

continues to build on its rich heritage of delivering high quality products to consumers at attractive prices."

37.     Given the Company's recent performance and future prospects, the consideration shareholders are to receive is inadequate. Del Monte shareholders are being cashed out at the unfairly low price of $19.00 per share, which doesn't adequately take into account the tremendous growth potential for Del Monte. Further, at least one Wall Street analyst had a price target of $22.00 per share before the Proposed Transaction was announced.

38.     In addition, in a research note an analyst at D.A. Davidson & Company noted that the Proposed Transaction made sense for the Buyout Group from a numbers perspective, noting that Del Monte was trading at a low price-to-earnings ratio of under 10, was on track to realize $259.2 million in free cash flow for this year, and its pet food business, which featured brands like Meow Mix, was heavily undervalued. Accordingly, Buyout Group is picking up Del Monte at the most opportune time, at a time when Del Monte is poised for growth and its stock price is trading at a huge discount to its intrinsic value.

**The Preclusive Deal Protection Devices**

39.     In addition, on November 30, 2010, the Company filed a Form 8-K with the United States Securities and Exchange Commission ("SEC") wherein it disclosed the operating Agreement and Plan of Merger for the Proposed Transaction (the "Merger Agreement"). As part of the Merger Agreement, Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and ensure that no competing offers will emerge for the Company.

40.     In particular, §6.5(a) of the Merger Agreement allows the Company to solicit parties for a mere 45 days, until January 15, 2010. Upon expiration of the "go-shop" period, a strict "no solicitation" provision kicks in pursuant to § 6.5(b) and the Company must "immediately cease"

- 12 -

soliciting other parties as well as engaging in discussions or negotiations with them in order to obtain a price in excess of the amount offered by the Buyout Group. At that point, the Company may continue in discussions with only those parties that meet the strict definition of being considered an "Excluded Party." An Excluded Party is a party from whom the Company has received an acquisition proposal during the go-shop period of which "the Company Board or any appropriate committee thereof determines in its good faith judgment..., after consultation with the Company's financial advisor and outside counsel, is, or could reasonably be expected to result in, a Superior Proposal,"

41.     Pursuant to §6.5 of the Merger Agreement, should the Company receive a competing bid, the Company must notify the Buyout Group of the bidder's offer. Thereafter, should the Board determine that the competing offer is superior, the Buyout Group must be provided with three business days notice before the Company changes its recommendation on the Proposed Transaction. If, during this time, the Buyout Group proposes an amendment to the Merger Agreement so that the competing bid ceases to constitute a superior proposal, i.e. the Buyout Group needs to merely match the superior offer, the Board, pursuant to § 6.5, can not recommend the competing bid. The Buyout Group is able to match the competing offer because it is granted unfettered access to the unsolicited offer, in its entirety, eliminating any leverage that the Company has in receiving the offer.

42.     In other words, the Merger Agreement gives the Buyout Group access to any rival bidder's information and allows the Buyout Group a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse, because the Merger Agreement unfairly assures that any "auction" will favor the Buyout Group and piggy-back upon the due diligence of the foreclosed second bidder.

43.     In addition, the Merger Agreement provides that a termination fee of $120,000,000 (or $60,000,000 in the event that the competing bid resulted from the "go-shop" process) and must

be paid to the Buyout Group by Del Monte if the Company decides to pursue said other offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

***Barclays Capital's Conflict of Interest***

44.     In connection with the merger, the Company's financial advisor, Barclays Capital delivered a fairness opinion to the Board that the $19.00 per share cash consideration was fair to the Company's stockholders. In addition, as described in more detail below, Barclays Capital led the negotiations with the Buyout Group and was the sole representative of the Company in many meetings and discussions with the Buyout Group. Moreover, Barclays Capital is responsible for soliciting parties in the "go-shop" period.  The credibility of the fairness opinion and Barclays Capital's motivations during its role as the Company's negotiator with the Buyout Group and solicitor during the go-shop period is highly suspect considering Barclays Capital's material conflict of interest in the Proposed Transaction.

45.     Specifically, Barclays Capital is participating in the financing of the Proposed Transaction and will receive significant compensation due to its participation. As stated in the Proxy:

> Parent has entered into a commitment letter dated November 24, 2010, which we refer to as the debt commitment letter, with JPMorgan Chase Bank, N.A., J.P. Morgan Securities LLC, ***Barclays Capital, the investment banking division of Barclays Bank PLC***, Morgan Stanley Senior Funding, Inc., Bank of America, N.A., Merrill Lynch, Pierce, Fenner & Smith Incorporated, KKR Corporate Lending LLC and KKR Capital Markets LLC, pursuant to which JPMorgan Chase Bank, N.A., Barclays Bank PLC, Morgan Stanley Senior Funding, Inc., Bank of America, N.A. and KKR Corporate Lending LLC (collectively, the lenders) have committed to provide senior secured credit facilities in an aggregate principal amount of up to $3.0 billion, comprised of a $2.5 billion senior secured term loan facility and a $0.5 billion senior secured revolving credit facility, and up to $1.6 billion of senior unsecured increasing rate loans under a senior unsecured bridge credit facility. It is expected that in connection with the merger, senior unsecured notes will be issued and sold pursuant to a high yield senior notes offering in lieu of all or a portion of, or to refinance, any drawings under the senior unsecured bridge credit facility. [Emphasis Added].

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

As further stated in the Proxy, the Company "has requested that Barclays Capital and certain of its affiliates participate in the financing necessary for the merger, for which services Barclays Capital and its affiliates will receive significant compensation." The exact terms of Barclays Capital's individual involvement in the financing, including the amount they have committed to provide, the corresponding interest rates, and the significant compensation they will receive has been disclosed.

46.     Barclays Capital has played a significant role throughout the sales process. In January 2010, Barclays Capital assisted the Company in contacting five private equity firms to seek their interest in a transaction with the Company. As a result of this process, the Board received a number of indications of interest, but ultimately determined not to proceed with the interested parties regarding a potential sale of the Company, due to among other reasons, the Company's strong results in the prior quarter and the Company's plans with respect to marketing and product innovation.

47.     On October 11, 2010, KKR submitted an unsolicited written indication of interest to defendant Wolford indicating that KKR and Centerview were interested in acquiring the Company. On October 25, 2010, the Board met and determined to proceed with discussions with KKR and Centerview regarding a potential sale of the Company. At this meeting, the Board also determined to reengage Barclays Capital as its financial advisor.

48.     Thereafter, Barclays Capital, on the Company's behalf, took over the negotiations with KKR and Centerview and was the sole representative of the Company in many meetings and discussions with KKR and Centerview. For example, as stated in the Proxy:

> On or about October 27, 2010, at the direction of the board of directors, *representatives of Barclays Capital contacted representatives of KKR and Centerview* to indicate that the board of directors was not prepared to accept their $17.50 per share indication of interest...

* * *

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

Later on November 9, 2010, *representatives of Barclays Capital contacted representatives of KKR* and informed them that the board of directors had authorized KKR/Centerview to begin its in depth business due diligence review of the Company, engage potential sources of debt financing and commence negotiation of transaction documents....

* * *

Later during the week of November 8, 2010, *KKR and Centerview approached Barclays Capital* about the possibility of including Vestar in the deal as an additional member of the sponsor group....

49.   During the week of November 15, 2010, representatives of KKR discussed with representatives of Barclays Capital and the Company the possibility of Barclays Capital participating in the financing necessary for the Proposed Transaction. The Board determined to allow Barclays Capital to participate in the financing of the Proposed Transaction. And Barclays Capital did in fact participate as described above.

50.   Recognizing Barclays Capital's conflict of interest, the Board thereafter engaged Perella Weinberg Partners LP ("Perella Weinberg") as an additional financial advisor. However, despite their significant conflict of interest, the Board continued to allow Barclays Capital to serve as their main representative in the negotiations with the Buyout Group. For example, as stated in the Proxy:

Between November 19, 2010 and November 22, 2010, *the sponsors and representatives of Barclays Capital had various discussions* surrounding the price per share to be paid by the sponsors in the proposed merger.

* * *

On November 22, 2010, the board of directors met, together with representatives of Barclays Capital and Gibson Dunn....Afterwards, the board of directors was updated [by Barclays] as to the status of negotiations with the sponsors.

* * *

During the day on November 23, 2010, representatives of Gibson Dunn and Simpson Thacher *and representatives of Barclays Capital and KKR continued to negotiate the terms of the proposed transaction.*

- 16 -

51.     In addition, "Barclays Capital has been requested to solicit third party indications of interest in the possible acquisition of all or a part of the Company's business" during the go-shop period. Barclays Capital has a significant interest in having the deal with the Buyout Group go through, and may not receive the same type of interest in a deal with a competing company. Accordingly, the go-shop process is materially tainted.

52.     In all, due to Barclays Capital's material conflict of interest in the Proposed Transaction, the process conducted by the Board is materially flawed and did not adequately ensure that the Company's stockholders receive the best available transaction.

***Del Monte's Executives Officers and Directors Stand to Receive Unique Material Financial Benefits in the Acquisition Not Available to Del Monte's Public Shareholders***

53.     The Company's executive officers and directors have material conflicts of interest and are acting to better their own personal interests through the Proposed Transaction at the expense of Del Monte's public shareholders.

54.     For example, the Company's directors hold restricted stock units of the Company that upon completion of the Proposed Transaction will no longer be subject to restriction and will be converted into a right to receive $19 per share. By cashing out their previously restricted units, directors Armacost, Bruer, Henderson, Lund, Martin, McCollam, Morgan, and Williams will each receive $353,248 as a result of the Proposed Transaction.

55.     In addition, the Company's executive officers, including Defendant Wolford, hold unvested stock options, performance share units, performance accelerated restricted stock units, other restricted stock units, and deferred stock units of the Company, all of which will become automatically vested and/or no longer be subject to restrictions. Accordingly, upon consummation of the Proposed Transaction, the executive officers will be able to cash out these previously unvested and/or restricted share and will receive the Proposed Transaction consideration of $19 for

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

each such share. The following charts show the value of the unvested stock options, performance share units, performance accelerated restricted stock units, other restricted stock units, and deferred stock units that each of the Company's executive officers will be bale to cash out upon consummation of the Proposed Transaction:

| Executive | | | Proceeds from Unvested Options ($) |
|---|---|---|---|
| Richard G. Wolford (Chairman of the Board, President and Chief Executive Officer) | $ | $ | 12,638,634 |
| David L. Meyers (Executive Vice President, Administration and Chief Financial Officer) | | | 2,695,901 |
| Nils Lommerin (Chief Operating Officer) | | | 4,463,185 |
| Timothy A. Cole (Executive Vice President, Sales) | | | 2,360,468 |
| David W. Allen (Executive Vice President, Operations) | | | 1,765,540 |
| Larry E. Bodner (Executive Vice President, Finance) | | | 1,704,199 |
| Richard W. Muto (Executive Vice President and Chief Human Resources Officer) | | | 1,228,950 |
| Marc L. Brown (Senior Vice President, Corporate Service Center and Chief Information Officer) | | | 1,221,854 |
| Richard L. French (Senior Vice President, Treasurer, Chief Accounting Officer and Controller) | | | 1,183,621 |
| William D. Pearce (Senior Vice President, Chief Marketing Officer) | | | 2,480,186 |
| James G. Potter (Senior Vice President, General Counsel and Secretary) | | | 1,185,415 |

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

| Executive | Proceeds from Performance Share Units ($) |
|---|---|
| Richard G. Wolford | $16,524,300 |
| David L. Meyers | 3,545,400 |
| Nils Lommerin | 5,611,650 |
| Timothy A. Cole | 3,023,850 |
| David W. Allen | 2,334,150 |
| Larry E. Bodner | 2,163,150 |
| Richard W. Muto | 1,482,000 |
| Marc L. Brown | 1,573,200 |
| Richard L. French | 1,496,250 |
| William D. Pearce | 1,464,900 |
| James G. Potter | 1,490,550 |

| Executive | Proceeds from Performance Accelerated Restricted Stock Units ($) |
|---|---|
| Richard G. Wolford | $3,382,000 |
| David L. Meyers | 735,300 |
| Nils Lommerin | 1,225,500 |
| Timothy A. Cole | 653,600 |
| David W. Allen | 442,700 |
| Larry E. Bodner | 442,700 |
| Richard W. Muto | 343,900 |
| Marc L. Brown | 349,600 |
| Richard L. French | 326,800 |
| William D. Pearce | 423,700 |
| James G. Potter | 326,800 |

| Executive | Proceeds from Restricted Stock Units ($) |
|---|---|
| Richard G. Wolford | $1,305,300 |
| David L. Meyers | 256,500 |
| Nils Lommerin | 490,200 |
| Timothy A. Cole | 233,700 |
| David W. Allen | 212,800 |

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

| | |
|---|---|
| Larry E. Bodner | 212,800 |
| Richard W. Muto | 142,500 |
| Marc L. Brown | 106,400 |
| Richard L. French | 125,400 |
| William D. Pearce | 121,600 |
| James G. Potter | 127,300 |

| Executive | Proceeds from Deferred Stock Units ($) |
|---|---|
| David L. Meyers | 329,476 |
| Nils Lommerin | 406,819 |
| Timothy A. Cole | 113,092 |
| David W. Allen | 128,969 |
| Larry E. Bodner | 22,023 |

56.     In addition, certain of the Company's executive officers, including Defendant Wolford, have employment agreements with the Company pursuant to which they are entitled to severance benefits in the case they are terminated within two years following a change-of-control. Pursuant to Wolford's employment agreement, he would be entitled to severance benefits of $8,388,914, which is $2,349,270 greater than severance benefits he would be entitled to upon a termination without a change in control.

57.     Based on the above, the Proposed Transaction is unfair to Del Monte's public shareholders, and represents an effort by the Individual Defendants to aggrandize their own financial position and interests at the expense of and to the detriment of Class members.

*The Materially Misleading and Incomplete Proxy Statement*

58.     On December 15, 2010, the Company filed the Proxy with the SEC in connection with the Proposed Transaction. The Proxy fails to provide the Company's shareholders with

material information and/or provides them with materially misleading information thereby rendering the shareholders unable to cast an informed vote regarding the Proposed Transaction.

59.     First, as described above, Barclays Capital is participating in the financing of the Proposed Transaction. However, the Proxy fails to disclose the financial and other terms of Barclays Capital's individual involvement in the financing, including the amount they have committed to provide and the corresponding interest rates.  As stated in the Proxy, the Company "has requested that Barclays Capital and certain of its affiliates participate in the financing necessary for the merger, for which services Barclays Capital and its affiliates will receive significant compensation." The Proxy must disclose the amount of the "significant compensation" that will be received by Barclays Capital. Disclosure of this information is materially important as it weighs in on the credibility of Barclays Capital's fairness opinion as well as their motivations while negotiating the Proposed Transaction on behalf of the Company.  The Proxy should also disclose (a) when Barclays Capital first decided that it was interested in participating in the financing of the Proposed Transaction; (b) the "benefits and risks associated with allowing Barclays Capital to participate in the financing" that was discussed by the Board on November 15, 2010; (c) the reasons the Board determined on November 15, 2010 that it was in the "best interests of the Company" to have Barclays act as a financing source; (d) the reasons the Board allowed Barclays Capital to continue to act as its financial advisor as well as lead the negotiations with the Buyout Group, as indicated by Barclays Capital's continued involvement as the Company's representatives in the meetings and communications with the Buyout Group between November 19th and November 24th, 2010; and (e) the reasons the Company chose Barclays Capital to solicit parties on the Company's behalf during the "go-shop" period considering Barclays Capital's conflict of interest.   Lastly, the Proxy must disclose whether Barclays Capital has performed any services with any members of the

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

Buyout Group in the past two years, and if so to disclose the nature and extent of the services and

the amount of compensation received for such services.

60.     In addition, the Proxy completely fails to disclose the underlying methodologies,

projections, key inputs and multiples relied upon and observed by Barclays Capital and Perella

Weinberg, the Company's financial advisors, so that shareholders can properly assess the credibility

of the various analyses performed by Barclays and Perella Weinberg and relied upon by the Board

in recommending the Proposed Transaction.  In particular, with respect to the financial analyses

conducted by Barclays Capital, the Proxy is deficient and should provide, *inter alia*, the following:

> (i)     All line items in the Company's projections that were used by Barclays to calculate the Company's free cash flows in the *Discounted Cash Flow Analysis*, including capital expenditures, net working capital, stock based compensation, and depreciation and amortization.

> (ii)    The free cash flow amounts of the Company for years 2011 through 2016 calculated by Barclays Capital in the *Discounted Cash Flow Analysis.*

> (iii)   The assumptions and calculations made by Barclays to determine free cash flows of the Company for years 2015 and 2016 in the *Discounted Cash Flow Analysis.*

> (iv)    The criteria used to select the terminal EBITDA multiples of 6.5x to 7.5x used in the *Discounted Cash Flow Analysis.*

> (v)     The key inputs used to calculate the Company's weighted average cost of capital ("WACC") of 7.5% to 8.5% used in the *Discounted Cash Flow Analysis*, including the Company's beta, the betas of comparable companies, the risk free rate, and the market risk premium used.

> (vi)    The criteria used to determine which companies Barclays "deemed comparable" to the Company that were selected in the *Selected Comparable Company Analysis.*

> (vii)   The EV/2011 EBITDA multiples observed for each company in the *Selected Comparable Company Analysis* as well as what were the "historical" EBITDA multiples that were observed for each company.

(viii)   The qualitative judgments made by Barclays in selecting the 6.5x to 8.0x reference range selected in the *Selected Comparable Company Analysis.*

(ix)   The adjustments made by Barclays Capital to the purchase prices, financial multiples, and EBITDA of the transactions used in the *Selected Precedent Transaction Analysis.* The metrics pre and post-adjustment should be disclosed.

(x)   The Enterprise Value/LTM EBITDA multiples observed for each transaction (as well as any adjustments made by Barclays Capital to such multiples) in the *Selected Precedent Transaction Analysis.*

(xi)   The qualitative judgments made by Barclays Capital in selecting the 8.0x to 10.0x reference range selected in the *Selected Precedent Transaction Analysis.*

61.   With respect to the financial analyses conducted by Perella Weinberg, the Proxy is deficient and should provide, *inter alia*, the following:

(i)   All line items in the Company's projections that were used by Perella Weinberg to calculate the Company's free cash flows in the *Discounted Cash Flow Analysis*, including capital expenditures, net working capital, and depreciation and amortization.

(ii)   What "other adjustments" and "certain assumptions" were made by Perella Weinberg in calculating the Company's free cash flows in the *Discounted Cash Flow Analysis.*

(iii)   The free cash flow amounts of the Company for years 2011 through 2014 calculated by Perella Weinberg in the *Discounted Cash Flow Analysis.*

(iv)   The key inputs used by Perella Weinberg to calculate the Company's WACC in the *Discounted Cash Flow Analysis* including betas, risk premiums, and assumed capital structure.

(v)   The criteria used to select the terminal year multiples of 6.5x to 7.5x used in the *Discounted Cash Flow Analysis.*

(vi)   The 1-day, 1-week, and 1-month premiums observed for each transaction or at least the high, low, mean, and median premiums observed for the transactions in the *Premium Paid Statistics* analysis.

(vii)   The criteria used to determine which transactions had target companies that were considered "relevant companies" and thus used in the *Precedent Transaction Analysis.*

- 23 -

(viii)   The EV/LTM EBITDA multiple observed for each transaction in the *Precedent Transaction Analysis*.

(ix)   The criteria and judgments made by Perella Weinberg to select the multiple range of 8.0x to 10.0x used in the *Precedent Transaction Analysis*.

(x)   The criteria used by Perella Weinberg to select the companies it deemed "relevant" that were used in the *Public Company Comparison* analysis.

(xi)   The multiples observed for each company in the *Public Company Comparison* analysis.

62.   The Proxy also fails to disclose material information concerning the events leading up to the announcement of the Proposed Transaction, including the process conducted by the Board in seeking potential partners and their evaluation of other strategic alternatives. In particular, the Proxy:

(i)   Fails to disclose the reasons the Company did not contact strategic parties also when it determined to contact five private equity firms following Bidder A's submission of an indication of interest in January 2010.

(ii)   Fails to disclose the "assumptions underlying the Company's LRP, including the risks associated with such assumptions in light of difficult industry trends and the challenging competitive landscape," discussed by the Board on October 25, 2010.

(iii)   Fails to disclose "the value that could potentially be delivered to the Company's stockholders under the LRP if the Company were to proceed on an independent basis," and the "various assumptions underlying such plan and the risks and uncertainties associated therewith" discussed by the Board on October 25, 2010.

(iv)   States that on October 25, 2010, the Board discussed the benefits and risks associated with an updated pre-signing market check versus a post-signing market check, but it fails to disclose the risks and benefits discussed, as well as the reasons the Board determined not to conduct an updated pre-singing market check.

(v)   Fails to disclose when Perella Weinberg was hired as the Company's financial advisor as well as whether other investment advisors were considered.

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

63.     Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I
**Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder**

64.     Plaintiff repeats all previous allegations as if set forth in full herein.

65.     Defendants have issued the Proxy with the intention of soliciting shareholder support of the Proposed Transaction.

66.     Rule 14a-9, promulgated by SEC pursuant to Section 14(a) of the Exchange Act provides that a proxy statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

67.     Specifically, the Proxy violates the Section 14(a) and Rule 14a-9 because it omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants should have know that the Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

68.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to cast a fully informed vote

1   if such misrepresentations and omissions are not corrected prior to the vote on the Proposed

2   Transaction.

## COUNT II
### Breach of Fiduciary Duty – Failure to Maximize Shareholder Value
### (Against All Individual Defendants)

69.     Plaintiff repeats all previous allegations as if set forth in full herein.

70.     As Directors of Del Monte, the Individual Defendants stand in a fiduciary relationship to Plaintiff and the other public stockholders of the Company and owe them the highest fiduciary obligations of loyalty and care.   The Individual Defendants' recommendation of the Proposed Transaction will result in change of control of the Company which imposes heightened fiduciary responsibilities to maximize Del Monte's value for the benefit of the stockholders and requires enhanced scrutiny by the Court.

71.     As discussed herein, the Individual Defendants have breached their fiduciary duties to Del Monte shareholders by failing to engage in an honest and fair sale process.

72.     As a result of the Individual Defendants' breaches of their fiduciary duties, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Del Monte's assets and will be prevented from benefiting from a value-maximizing transaction.

73.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction, to the irreparable harm of the Class.

74.     Plaintiff and the Class have no adequate remedy at law.

## COUNT III
### Breach of Fiduciary Duty -- Disclosure
### (Against Individual Defendants)

75.     Plaintiff repeats all previous allegations as if set forth in full herein.

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

76.     The fiduciary duties of the Individual Defendants in the circumstances of the Proposed Transaction require them to disclose to Plaintiff and the Class all information material to the decisions confronting Del Monte's shareholders.

77.     As set forth above, the Individual Defendants have breached their fiduciary duty through materially inadequate disclosures and material disclosure omissions.

78.     As a result, Plaintiff and the Class members are being harmed irreparably.

79.     Plaintiff and the Class have no adequate remedy at law.

## COUNT IV
### Aiding and Abetting
**(Against Del Monte, Blue Acquisition Group, Inc., and Blue Merger Sub, Inc.)**

80.     Plaintiff repeats all previous allegations as if set forth in full herein.

81.     As alleged in more detail above, Del Monte, Blue Acquisition Group, Inc., and Blue Merger Sub, Inc. are well aware that the Individual Defendants have not sought to obtain the best available transaction for the Company's public shareholders.   Defendants Del Monte, Blue Acquisition Group, Inc., and Blue Merger Sub, Inc. aided and abetted the Individual Defendants' breaches of fiduciary duties.

82.     As a result, Plaintiff and the Class members are being harmed.

83.     Plaintiff and the Class have no adequate remedy at law.

**WHEREFORE**, Plaintiff demands judgment against Defendants jointly and severally, as follows:

(A)     declaring this action to be a class action and certifying Plaintiff as the Class representatives and her counsel as Class counsel;

(B)     declaring that the Proxy is materially misleading and contains omissions of material fact in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

(C)    enjoining, preliminarily and permanently, the Proposed Transaction;

(D)    in the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

(E)    directing that Defendants account to Plaintiff and the other members of the Class for all damages caused by them and account for all profits and any special benefits obtained as a result of their breaches of their fiduciary duties;

(F)    awarding Plaintiff the costs of this action, including a reasonable allowance for the fees and expenses of Plaintiff's attorneys and experts; and

(G)    granting Plaintiff and the other members of the Class such further relief as the Court deems just and proper.

DATED:  December 20, 2010            **LEVI & KORSINSKY, LLP**

DAVID E. BOWER
600 Corporate Pointe, Suite 1170
Culver City, CA  90230-7600
Tel: 310-839-0442
Fax: 310-558-3005

**LEVI & KORSINSKY, LLP**
Joseph Levi (to be admitted *pro hac vice*)
30 Broad Street, 15th Floor
New York, NY  10004
Tel: 212-363-7500
Fax: 212-363-7171

Attorneys for Plaintiff

- 28 -

CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Sarah P. Heintz, certify that:

1. I am the Plaintiff and I have reviewed the complaint and authorized its filing by Levi & Korsinsky, LLP.

2. I did not purchase the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. My transaction(s) in Del Monte Foods Company securities which are the subject of this litigation during the class period set forth in the complaint are as follows:

| Security | Date of Transaction | Number of Shares Purchased or Sold | Cost |
|---|---|---|---|
| Del Monte Foods Company | 11-19-10 | 75 | 1312.50 |
| Del Monte Foods Company | | | |

5. Within the last 3 years, I have not served as a class representative in any federal securities fraud case.

6. I will not accept any payment for serving as a representative party on behalf of the class, except to receive my pro rata share of any recovery or as ordered or approved by the court, including any award for reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I hereby certify, under penalty of perjury, that the foregoing is true and correct.

Dated: December 17, 2010

_Sarah P. Heintz_
Sarah P. Heintz
12-17-10

Sarah Heintz
PO Box 988
Lucerne Valley, CA 92356-0988

## CERTIFICATION OF ATTORNEY UNDER SECURITIES LITIGATION LAWS

I, David E. Bower, certify,

1.      I am an attorney, admitted to practice in the State of California and in the United States District Court for the Northern District of California. My state bar number is 119546. I am the attorney for the plaintiff, Sarah P. Heintz, in this matter and I make this declaration based upon my personal knowledge of the facts set forth herein.

2.      I do not, directly, or indirectly, own or otherwise have any beneficial interest in the securities of Del Monte Foods or in any securities that are related in any manner to the proceedings or subject matter of this action.

I declare, under penalty of perjury, pursuant to the laws of the State of California and all federal laws, that the foregoing is true and correct.

December 20, 2010

David E. Bower